

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-2000

# United States v. Gregg

Precedential or Non-Precedential:

Docket 99-5079, 99-5124, 99-5205

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Gregg" (2000). *2000 Decisions.* Paper 189.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/189

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 7, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 99-5079, 99-5124, 99-5205

UNITED STATES OF AMERICA, Appellant in No. 99-5079

v.

JOSEPH R. GREGG; RUBY C. MCDANIEL; LUIS
MENCHACA; FRANCIS S. PAGNANELLI; WILLIAM
CHARLES RAISER; MICHAEL HENRY; ROSE KIDD;
ARNOLD MATHESON; KATHARINE O'KEEFE; EVA
ALVARADO; JOSEPH F. O'HARA; JOSEPH ROACH;
ROBERT RUDNICK; JAMES SODERNA; JAMES SWEATT;
ELIZABETH WAGI; BYRON ADAMS; KEVIN BLAKE; AMY
BOISSONNEAULT; BALDO DINO; STEPHEN C. ELLIOT;
SHERYL FITZPATRICK; MARY FOLEY; DENNIS GREEN;
GEORGE LYNCH; RAYMOND MICCO; ALEXIS
MULRENAN; RALPH TRAPHAGEN; JAMES TROTT;
KIMIKO TROTT

UNITED STATES OF AMERICA

v.

JOSEPH R. GREGG; RUBY MCDANIEL; LUIS MENCHACA;
FRANCIS S. PAGNANELLI; WILLIAM RAISER; MICHAEL A.
HENRY; ROSE KIDD; ARNOLD MATHESON; KATHARINE
O'KEEFE; EVA ALVARADO; JOSEPH O'HARA; JOSEPH H.
ROACH; ROBERT RUDNICK; JAMES SODERNA; JAMES
SWEATT; ELIZABETH WAGI; BYRON ADAMS; KEVIN
BLAKE; AMY BOISSONNEAULT; BALDO DINO; STEPHEN
ELLIOT; SHERYL FITZPATRICK; MARY FOLEY; DENNIS
GREEN; GEORGE LYNCH; RAYMOND MICCO; ALEXIS
MULRENAN; RALPH TRAPHAGEN; JAMES TROTT;
KIMIKO TROTT

Rose Kidd; James Sweatt; Elizabeth Wagi;
Raymond Micco; William Raiser; James Soderna;
Kevin Blake; Baldo Dino;
Appellants in No. 99-5124

UNITED STATES OF AMERICA

v.

JOSEPH R. GREGG; RUBY MCDANIEL; LUIS MENCHACA;
FRANCIS PAGNANELLI; WILLIAM RAISER; MICHAEL A.
HENRY; ROSE KIDD; ARNOLD MATHESON; KATHARINE
O'KEEFE; EVA ALVARADO; JOSEPH O'HARA; JOSEPH H.
ROACH; ROBERT RUDNICK; JAMES SODERNA; JAMES
SWEATT; ELIZABETH WAGI; BYRON ADAMS; KEVIN
BLAKE; AMY BOISSONNEAULT; BALDO DINO; STEPHEN
ELLIOT; SHERYL FITZPATRICK; MARY FOLEY; DENNIS
GREEN; GEORGE LYNCH; RAYMOND MICCO; ALEXIS
MULRENAN; RALPH TRAPHAGEN; JAMES TROTT;
KIMIKO TROTT

Francis S. Pagnanelli, Appellant in No. 99-5205

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 97-cv-02020)
District Judge: Honorable John C. Lifland

Argued: April 25, 2000

Before: BECKER, Chief Judge, WEIS and
OAKES,* Circuit Judges.

(Filed: September 7, 2000)

_____

* Honorable James L. Oakes, United States Circuit Judge for the Second
Circuit, sitting by designation.

2

FAITH S. HOCHBERG, ESQUIRE
United States Attorney
COLETTE R. BUCHANAN, ESQUIRE
Assistant United States Attorney
Federal Building, Suite 700
970 Broad Street
Newark, NJ 07102-23535

BILL LANN LEE, ESQUIRE
Acting Assistant Attorney General
DAVID K. FLYNN, ESQUIRE
JENNIFER LEVIN, ESQUIRE
 (ARGUED)
Department of Justice
Civil Rights Division
P.O. Box 66078
Washington, DC 20035-6078

Counsel for Appellants/
Cross-Appellees

EDWARD J. GILHOOLY, ESQUIRE
 (ARGUED)
14 Franklin Street
Morristown, NJ 07960

Counsel for Appellee/
Cross-Appellant Francis S. Pagnanelli

MICHAEL C. PELLETIER, ESQUIRE
335 Route 24, P.O. Box 700
Chester, NJ 07930

Counsel for Appellee Eva Alvarado

RUSSELL J. PASSAMANO, ESQUIRE
65 Madison Avenue
Morristown, NJ 07960

Counsel for Appellees/
Cross-Appellants William Raiser,
Rose Kidd, James Soderna,
James Sweatt, Elizabeth Wagi,
Baldo Dino, Raymond Micco

DONALD DESMOND CAMPBELL,
 ESQUIRE
186 Sherman Avenue
Berkeley Heights, NJ 07922

Counsel for Appellee Joseph O'Hara

RALPH COTI, ESQUIRE
Herriot, Coti & Sugrue
36 West 44th Street, Suite 400
New York, NY 10036

Counsel for Appellee Joseph H.
Roach

WILLIAM C. CAGNEY, ESQUIRE
Lane & Mittendorf
99 Wood Avenue South
Metro Corporate Campus I
Iselin, NJ 08830

Counsel for Appellee Byron Adams

MICHAEL O. CUMMINGS, ESQUIRE
Morgan, Finnegan, Pine, Foley & Lee
345 Park Avenue
New York, NY 10154

Counsel for Appellee Kevin Blake

PETER M. BURKE, ESQUIRE
Cooper, Rose, & English
480 Morris Avenue
Summit, NJ 07901

Counsel for Appellee George Lynch

OPINION OF THE COURT

OAKES, Circuit Judge.

In this case, the United States appeals the decision of the District Court for the District of New Jersey (John C. Lifland, Judge) that the defendants are jointly and severally liable, rather than individually liable, for statutory damages of $5,000 "per violation" of the Freedom of Access to Clinic

4

Entrances Act ("FACE" or "the Act"), 8 U.S.C. S 248 (2000). Several defendants filed cross appeals, arguing that FACE is a violation of Congress's authority under the U.S. Constitution's Commerce Clause and of the First Amendment. We conclude that damages under FACE are properly awarded jointly and severally among defendants and that FACE is constitutional. Accordingly, we affirm the district court.

BACKGROUND

On April 18, 1997, the United States, through the United States Attorney General, filed a complaint for injunctive relief and statutory damages against thirty defendants1 who, the Attorney General alleged, were an ongoing threat to the Metropolitan Medical Associates ("MMA"), a reproductive health clinic in Englewood, New Jersey, its employees and persons seeking reproductive health services at MMA. Specifically, the Attorney General alleged that each defendant participated in one, two, or three protests that obstructed access to MMA in violation of FACE. In the prayer for relief in the Complaint, the Attorney General elected to pursue statutory damages of $5,000 per defendant in lieu of proving actual damages to MMA.

The district court held an evidentiary hearing on July 8– 10, 1997, on the Attorney General's motion for a preliminary injunction. The evidence at the hearing demonstrated that five of the named defendants blocked access to MMA on August 7, 1996, twelve of the named defendants blocked access to MMA on January 18, 1997,

_____

1. The defendants named in the complaint are Joseph R. Gregg, Ruby C. McDaniel, Luis Menchaca, Francis S. Pagnanelli, William Charles Raiser, Michael Henry, Rose Kidd, Arnold Matheson, Katharine O'Keefe, Eva Alvarado, Joseph Roach, Robert Rudnick, James Soderna, James Sweatt, Elizabeth Wagi, Byron Adams, Kevin Blake, Amy Boissonneault, Baldo Dino, Stephen C. Elliot, Sheryl Fitzpatrick, Mary Foley, Dennis Green, George Lynch, Raymond Micco, Alexis Mulrenan, Ralph Traphagen, James Trott, and Kimiko Trott. The Attorney General dismissed the charges against Mary Foley and her name has been removed from the caption. They will be referred to in this opinion collectively as "the defendants" unless it is necessary to provide names.

5

and nineteen of the named defendants blocked access to MMA on March 15, 1997. Accordingly, on December 22, 1997, the district court enjoined defendants and their employees, agents, and others acting in concert with them, from blocking and impeding access to MMA, intimidating or attempting to intimidate or interfere with persons seeking access to MMA, and entering or being on MMA premises.

After the preliminary injunction was granted, the parties informed the district court that they disagreed over the proper interpretation of the civil remedies available under FACE. At the district court's request, the parties submitted briefs addressed to the proper interpretation of statutory damages under FACE. On June 18, 1998, after considering the parties' pleadings, the district court issued a memorandum wherein, rejecting the Attorney General's argument that statutory damages should be assessed on each defendant per violation, it concluded that the $5,000 statutory damages were to be assessed per violation and that all defendants who participated in each violation would be held jointly and severally liable for $5,000.

On December 11, 1998, the district court granted the Attorney General's motion for summary judgment and issued a Memorandum and Order Entering Final Judgment. See United States v. Gregg, 32 F. Supp. 2d 151 (D.N.J. 1998). The district court found that the defendants violated FACE when they conducted the three blockades. See id. at 153–58. The district court determined that Congress intended statutory damages of $5,000 to be assessed per violation and against all responsible persons severally. See id. at 160–61. Accordingly, the defendants were held jointly and severally liable for $5,000 in statutory damages for each violation in which they participated. See id. at 161 (holding five defendants jointly and severally liable for the August 7 blockade, twelve defendants jointly and severally liable for the January 18 blockade, and eighteen defendants jointly and severally liable for the March 15 blockade).

The Attorney General timely appealed the district court's decision and eight of the defendants2 cross appealed. The

_____

2. Rose Kidd, James Sweatt, Elizabeth Wagi, Raymond Micco, William Raiser, James Soderna, and Keven Blake filed a cross appeal on

6

Attorney General appeals that portion of the district court's decision that imposed the statutory damages jointly and severally. Defendants do not dispute the district court's findings that they violated FACE. Rather, Defendants contend that the Attorney General does not, under FACE, have the authority to elect statutory damages in lieu of proof of actual damages. In addition, they argue that FACE is an unconstitutional exercise of Congress's commerce power and that it violates defendants' rights guaranteed under the First Amendment of the Constitution.

DISCUSSION

We review the district court's award of summary judgment de novo. See Figueroa v. Blackburn, 208 F.3d 435, 439 (3d Cir. 2000).

I.

The task of resolving how statutory penalties are to be awarded under FACE is a question of statutory interpretation which begins by discerning the plain meaning of FACE's statutory penalty provision. If Congress's intent as to this issue is plain, referral to other canons of statutory construction is unnecessary. See Resolution Trust Corp. v. Nernberg, 3 F.3d 62, 64 (3d Cir. 1993); Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter[.]").

To determine a law's plain meaning, we begin with the language of the statute. See United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); New Rock Asset Partners v. Preferred Entity Advancements, 101 F.3d 1492, 1498 (3d Cir. 1996); Santa Fe Medical Services, Inc. v. Segal (In Re Segal), 57 F.3d 342, 345 (3d Cir. 1995). If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute

_____

February 18, 1999. Francis S. Pagnanelli filed a separate cross appeal on February 18, 1999. Their arguments were consolidated in one appellate brief.

is enforced according to its terms. See Ron Pair Enterprises, Inc., 489 U.S. at 241. Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose. See New Rock, 101 F.3d at 1498. Once the plain meaning of the statute is determined, it is conclusive "except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Id. (quoting Griffin v. Oceanic Contractors, Inc. , 458 U.S. 564, 571 (1982)).

Section 248(a) of FACE, in relevant part, provides:

> (a) Prohibited Activities. -- Whoever --

> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates, or interferes with or attempts to injure, intimidate, or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services

> . . .

> shall be subject to the . . . civil remedies provided in subsection (c)

18 U.S.C. S 248(a)(2000). FACE further prohibits the intentional damage or destruction of a facility because it provides reproductive health services. See id . Any person aggrieved by the foregoing actions may bring a civil action for relief. See 18 U.S.C. S 248(a)(1)(A) (2000).

In any action under FACE, a person aggrieved by conduct prohibited under the Act, may obtain "temporary, preliminary or permanent injunctive relief and compensatory and punitive damages." 18 U.S.C. S 248(c)(1)(B) (2000). In addition, FACE allows a plaintiff in a civil action to elect, "in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." 18 U.S.C. S 248(c)(1)(B) (2000). The Act permits the U.S. Attorney General and state attorneys general to bring civil actions for the same relief if they believe that a

8

person or group of persons has been aggrieved by violations of the Act. See 18 U.S.C. SS 248(c)(2), (3) (2000); H.R. Rep. No. 103-306, at 13 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 710. In civil actions brought by an attorney general,

> The court, to vindicate the public interest, may also assess a civil penalty against each respondent --
>
> (i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and
>
> (ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000 for any other subsequent violation.

18 U.S.C. S 248(c)(2)(B) (2000).

The Attorney General argues that the district court incorrectly awarded statutory damages per violation presumably to be shared by the defendants involved with each blockade and contends that FACE and its goals require statutory damages to be awarded $5,000 per defendant. We agree with the district court that the "dichotomy of expression" between the civil remedy provisions of FACE demonstrates Congress's intent that statutory damages be imposed per violation and jointly and severally among the defendants who participated in the blockade. Gregg, 32 F. Supp.2d at 160; see also Milwaukee Women's Medical Services, Inc. v. Brock, 2 F. Supp. 2d 1172, 1178 (E.D. Wis. 1998) (awarding statutory damages per violation rather than per defendant); Greenhut v. Hand, 996 F. Supp. 372, 379 (D.N.J. 1998) (same); Planned Parenthood of Southeastern Pennsylvania, Inc. v. Walton, 1998 WL 88373 at *1-2 (E. D. Penn. Feb. 12, 1998) (same).

In authorizing compensatory statutory damages of $5,000 in lieu of actual damages, Congress uses the phrase "per violation." 18 U.S.C. S 248(c)(1)(B). This is in sharp contrast to the language used in the provision permitting courts to assess substantial civil penalties to vindicate the public interest in cases brought by attorneys general. See 18 U.S.C. S 248(c)(2)(B). In S 248(c)(2)(B), an attorney general can request civil penalties of up to $25,000"against each respondent." Id. The language ofS 248(c)(2)(B)

9

illustrates that Congress knew how to explicitly instruct a court to assess damages per defendant rather than per violation. The absence of analogous "per respondent" language in S 248(c)(1)(B) and the use instead of the phrase "per violation" indicates that Congress carefully considered the issue and decided that compensatory statutory damages will be imposed per violation, a manner that differs from the civil penalties imposed to vindicate the public interest.

We disagree with the Attorney General that the use of "whoever" in S 248(a) means that compensatory statutory penalties are to be imposed individually. Section 248(a) defines the substantive liability under FACE. It does not address how, under the Act, civil compensatory damages are to be awarded. The use of the singular in that provision thus does not overcome the specific "per violation" language in the relevant remedy provision of the Act. Thus, the statutory language indicates that Congress intended that compensatory statutory damages, like those imposed in this case, are awarded per violation, presumably to be shared jointly and severally among the defendants who participated in the violation.

This interpretation is consistent with FACE's legislative history and the atmosphere of anti-abortion violence in which FACE was enacted. FACE was enacted in 1994 against a backdrop of escalating violence directed toward reproductive health clinics, their employees, and patients. Both the House and Senate Reports set forth detailed accounts of the virulent national campaign waged by anti-abortion activists. See H.R. Rep. No. 103-306, U.S.C.C.A.N., at 699. The evidence before Congress demonstrated that "this campaign of violence has lead to death, injury, harassment, fear, and thousands of arrests all across the nation." H.R. Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. Congress also set forth findings that state and local authorities had proved inadequate, and sometimes unwilling, to curb the violence. See S. Rep. No. 103-117, at 17-18 (1993); H.R. Rep. No. 103-306, at 6, 10, U.S.C.C.A.N., at 703, 707 ("state and local enforcement authorities have failed to address effectively the systematic and nationwide assault that is being waged against health

10

care providers and patients."). Consequently, Congress enacted FACE with substantial federal remedies to prevent the "use of blockades, violence and other forceful or threatening tactics against medical facilities and health care personnel who provide abortion-related services. . . ." S. Rep. No. 103-117, at 2. In sum, FACE serves two important goals: First, federal remedies help compensate individuals and health care facilities for the harm caused by blockades and, second, they serve to deter protesters from repeatedly violating the law.

The Attorney General argues that Congress intended statutory damages to be assessed per individual so that punishment would be imposed with the result of deterring defendants from violating FACE in the future. We agree with the Attorney General that deterrence is a primary goal of substantial federal penalties against clinic blockaders. This goal is well served by the availability of criminal sanctions, punitive damages, and civil penalties. See 18 U.S.C. SS 248(b), (c). Congress explained, however, that the statutory penalties described in S 248(c)(1)(B) are available "in lieu of actual damages." According to the Senate Report, they were included to ease the often difficult task of proving actual loss in a case where anti-abortionists' tactics close a clinic temporarily or interfere with a person's access to reproductive health services. The senate report stated that statutory damages were included "[b]ecause of the expense and other difficulties of proving actual damages (for example, a clinic's lost income)." S. Rep. No. 103-117 at 26. Accordingly, the statutory penalties elected by the Attorney General in this case were included with the goal of compensating the victims of the misconduct prohibited by FACE. As the district court noted "[o]ne person can just as effectively injure, interfere with, or intimidate as can a group, depending on the circumstances." Gregg , 32 F. Supp.2d at 160. Damages to compensate thus have no bearing on how many individuals caused the damage. Because the legislative history of FACE indicates that the purpose of the statutory damages is to compensate, it follows that Congress intended that compensatory statutory damages be awarded per violation regardless of how many people participated in the misconduct.

11

Finally, the Attorney General argues that joint and several liability among defendants encourages individuals to engage in large, rather than small, blockades. With joint and several liability, the Attorney General contends, the total damages award "per violation" remains the same, yet the more persons who violate the law, the smaller the amount each defendant must pay, thus perversely tending to encourage, rather than discourage, defendants to organize blockades using greater, rather than smaller, groups of people.

We are not convinced that awarding compensatory statutory penalties per violation rather than per defendant will cause defendants strategically to recruit more defendants for each violation. Because of the wide variety of remedies available under FACE, clinic blockaders will not know the penalties that they face for their misconduct and be able to plan accordingly. They will not know before the suit is filed whether an Attorney General or private plaintiff will opt for statutory damages in lieu of actual damages. See 18 U.S.C. S 248(c)(1)(B). They will also not know if they will be made subjects of a criminal prosecution and face criminal fines. See 18 U.S.C. S 248(b). Furthermore, in the case where an attorney general brings a civil action, he or she has the option of requesting that the court assess a civil penalty against each defendant in an amount as great as $25,000 in an appropriate case. See 18 U.S.C. S 248(c)(2)(B). Moreover, joint and several liability does not solely contemplate a group of liable defendants sharing the award among them. A liability is joint and several when "the creditor may sue one or more of the parties to such liability separately, or all of them together, at his [or her] option." Black's Law Dictionary 751 (5th ed. 1979). It is thus highly unlikely that a defendant or group of defendants would plan a clinic blockade or other violation of the Act in light of the penalty provisions under the Act. Because of the varying ways penalties under the Act may be assessed against a group of defendants involved in one violation, we are not convinced that the deterrent value of FACE is compromised by awarding the compensatory statutory damages jointly and severally as the Act plainly provides that they should be.

12

In sum, we conclude that Congress intended FACE's compensatory statutory damages be awarded per violation and jointly and severally among defendants. We base our conclusion primarily on Congress's use of "per violation" language in S 248(c)(1)(B) as opposed to the "per respondent" phrase in S 248(c)(2)(B). Furthermore, because Congress made statutory penalties available principally to ease the plaintiff 's burden of proving actual damages and other penalties to deter the misconduct prohibited by FACE are available, the $5,000 statutory damages are awarded per violation and jointly and severally among the participating defendants.

II.

Defendants argue that the Attorney General may not elect statutory damages in lieu of actual damages. Their argument misapprehends the statute and is belied by the Act's legislative history. Under FACE, the Attorney General of the United States and a state attorney general may commence a civil action against an individual or individuals who engage in the conduct prohibited by the Act. See 18 U.S.C. S 248(c)(2). The Act provides that in an action initiated by an attorney general, "the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B)." 8 U.S.C. S 248(c)(2)(B) (emphasis added). Defendants contend that the phrase "compensatory damages" as used in S 248(c)(2)(B) refers only to actual damages and not to statutory damages. However, S 248(c)(1)(B) defines compensatory damages as actual and statutory damages. See 18 U.S.C. S 248(c)(1)(B). Thus, by using the term "compensatory damages" in S 248(c)(2)(B), Congress plainly meant to incorporate all of the text relevant to compensatory damages as set out in S 248(c)(1)(B). Therefore, the phrase "compensatory damages" as used in S 248(c)(B) authorizes the attorney general to elect an award of statutory damages.

Furthermore, the legislative history demonstrates that Congress intended that statutory damages be awarded in a civil action initiated by an attorney general. The House

confirmed that "[t]he Act authorizes the U.S. Attorney General and State Attorneys General to bring civil causes of action on behalf of aggrieved persons for the same relief available in private actions; however, fees for attorney and expert witnesses may not be awarded to the United States." H.R. Rep. No. 103-106, at 3, U.S.C.C.A.N., at 700 (emphasis added). Because the relief available in private actions includes statutory damages and Congress intended that an attorney general be entitled to the same relief as a private party, we reject the defendants' position that the Attorney General may not elect statutory damages in this case.

III.

A. Commerce Clause.

We now turn to the question whether FACE falls within Congress's power under Article I, S 8 of the United States Constitution. The Commerce Clause empowers Congress to "regulate Commerce . . . among the several states." U.S. Const., Art. I, S 8, cl. 3. Whether FACE is a proper exercise of Congress's commerce power has been much discussed in published opinions of United States Courts of Appeals. Indeed, this is one of the last federal appellate tribunals to address the issue. After considering most, if not all, of the arguments presented by the defendants in this case, these courts held that FACE is valid under the Commerce Clause. See United States v. Hart, 212 F.3d 1067, 1074 (8th Cir. 2000); United States v. Weslin, 156 F.3d 292, 296 (2d Cir. 1998), cert. denied, 525 U.S. 1071 (1999); Hoffman v. Hunt, 126 F.3d 575, 582-88 (4th Cir. 1997), cert. denied, 523 U.S. 1136 (1998); United States v. Bird, 124 F.3d 667, 672-82 (5th Cir. 1997), cert. denied, 523 U.S. 1006 (1998); Terry v. Reno, 101 F.3d 1412, 1415-18 (D.C. Cir. 1996), cert. denied, 520 U.S. 1264 (1997); United States v. Soderna, 82 F.3d 1370, 1373-74 (7th Cir.), cert. denied, 519 U.S. 1006 (1996); United States v. Dinwiddie, 76 F.3d 913, 919-21 (8th Cir.), cert. denied, 519 U.S. 1043 (1996); United States v. Wilson, 73 F.3d 675, 679-88 (7th Cir. 1995), cert. denied, 519 U.S. 806 (1996); Cheffer v. Reno, 55 F.3d 1517, 1519-22 (11th Cir. 1995). Today, this Circuit aligns with the decisions of its sister courts of appeals and holds that

14

FACE is a proper exercise of Congress's Commerce Clause power.

In United States v. Lopez, 514 U.S. 549, 558-59 (1995), a decision aptly described by this Court as changing the Commerce Clause landscape, see United States v. Parker, 108 F.3d 28, 29 (3d Cir. 1997), the Supreme Court identified three broad categories of activity that Congress may regulate under its commerce power. Congress may: 1) "regulate the use of the channels of interstate commerce," Lopez, 514 U.S. at 558 (citations omitted); 2)"regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce even though the threat may come only from intrastate activity," Id. (citations omitted); and 3) "regulate those activities having a substantial relation to interstate commerce . . . i.e., those activities that substantially affect interstate commerce." Id. at 558-559 (citations omitted).

Although the judicial branch is the final arbiter of the constitutionality of a statute, courts review a congressional determination that it had the power to enact a particular piece of legislation with substantial deference. See Parker, 108 F.3d at 30; United States v. Bishop, 66 F.3d 569, 576-77 (3d Cir. 1995). It is not our job to "second-guess the legislative judgment of Congress" that blockades and violence directed at reproductive health clinics can be regulated under the Commerce Clause power but, rather, to ensure that Congress had a rational basis for that conclusion. Parker, 108 F.3d at 30 (quoting Bishop, 6 F.3d at 577). We hold that under Lopez and this Circuit's precedent, FACE is a proper exercise of Congress's power to regulate intrastate conduct that, in the aggregate, has a substantial effect on interstate commerce.3

In United States v. Morrison, ___ U.S. ___, 120 S. Ct. 1740, 1749-52 (2000), the Supreme Court's most recent communique on Lopez's third category of regulation, the Court provided a framework to determine whether a law

_____

3. Because we determine that FACE is a proper regulation of intrastate activity that has a substantial effect on interstate commerce, we do not reach the Attorney General's argument that FACE is also a proper regulation of instrumentalities in commerce.

regulates an activity that has a substantial effect on interstate commerce. The Court identified four relevant considerations. These are: 1) the economic nature of the regulated activity, see id. at 1750; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce, see id. at 1750-51; 3) express congressional findings regarding the effects upon interstate commerce of the activity in question, see id. at 1751; and 4) the link between the regulated activity and interstate commerce, see id. at 1751.

Morrison first asks a court to consider whether the federal law regulates intrastate economic or commercial activity. See id. at 1750. In Morrison , the Supreme Court noted, "In every case where we have sustained federal regulation under Wickard's aggregation principle, the regulated activity was of an apparent commercial character." Id. Accordingly, in Morrison, the Supreme Court invalidated the civil remedy provision of the Violence Against Women Act ("VAWA"), in part, because gender-motivated crimes "are not in any sense of the phrase, economic activity." Id. at 1751. In contrast to gender-motivated crime, the activity regulated by FACE-- the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services -- is activity with an effect that is economic in nature. Reproductive health clinics are income-generating businesses that employ physicians and other staff to provide services and goods to their patients. Motivated by anti-abortion sentiment, the primary goal of individuals and groups engaged in the misconduct prohibited by FACE is to temporarily and permanently interrupt the operations of reproductive health facilities and prevent individuals from accessing their services. See S. Rep. No. 103-117, at 11; H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the violent and obstructive acts directed at reproductive health facilities had caused millions of dollars of damage and forced clinics to close, caused serious and harmful delays in the provision of medical services and intimidated a number of physicians from offering abortion services. See S. Rep. No. 103-117, at

16

14; H.R. Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The effect of the conduct proscribed by FACE is to deter, and in some cases to stop completely, the commercial activity of providing reproductive health services. We thus hold that although the connection to economic or commercial activity plays a central role in whether a law is valid under the Commerce Clause, we hold that economic activity can be understood in broad terms. Pursuant to this principle, unlike the activity prohibited by VAWA, the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic. See Weslin, 156 F.3d at 296 (threats of violence that have the effect of deterring commercial activity is properly regulated under commerce clause); Hoffman, 126 F.3d at 587 (activity regulated by FACE, while not itself economic or commercial, "is closely and directly connected with an economic activity . . . therefore . . . we cannot conclude that FACE has nothing to do with commerce or any sort of economic enterprise"); Dinwiddie, 76 F.3d at 921 ("FACE prohibits interference with a commercial activity-- the provision and receipt of reproductive health services."); Cheffer, 55 F.3d at 1520 ("the Access Act does regulate commercial activity, the provision of reproductive health services.").

Morrison next instructs a court to consider the existence of a jurisdictional element. 120 S. Ct. at 1750-51."A jurisdictional element . . . refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." United States v. Rodia, 194 F.3d 465, 471 (3d Cir. 1999), cert. denied, ___ U.S. ___, 120 S. Ct. 2008 (2000). FACE does not contain an explicit jurisdictional element establishing that the federal cause of action is in pursuance of Congress's power to regulate interstate commerce. Although such an element would certainly lend support to the conclusion that FACE is tied to interstate commerce, we conclude that it was not necessary for Congress explicitly to limit the civil remedy provision in the case of regulating anti-abortion activity directed at reproductive health clinics that are, by definition, directly engaged in the business of providing reproductive health services. See Bird , 124 F.3d

17

at 675 (reasoning that a jurisdictional element is"not always a necessary" method to ensure that Congress does not exceed its commerce power).

Morrison also directs that the existence of congressional findings on the burden of the regulated activity on interstate commerce "may enable [a court] to evaluate the legislative judgment that the activity in question substantially affects interstate commerce." Morrison, 120 S. Ct. at 1752 (quoting Lopez, 514 U.S. at 563). Congress's conclusion that the activity proscribed by FACE burdens interstate commerce is a conclusion derived from months of legislative hearings, research, and debate. The Senate Judiciary Committee and the House Committee on Labor and Human Resources which considered the legislation before it became law submitted extensive reports on the necessity of FACE. See Bird, 124 F.3d at 678. Thus, Congress's conclusion that FACE is constitutional is entitled to judicial deference. See Parker, 108 F.3d at 29.

Finally, in accordance with the fourth factor of Morrison, the findings set forth in the House and Senate Committee Reports demonstrate that Congress had a rational basis upon which to conclude that the activities governed by FACE have a substantial effect on interstate commerce. As set out in detail below, the findings show that a national market for abortion-related services exists in this country and that reproductive health clinics are directly engaged in interstate commerce. The findings further demonstrate that a national movement engaged in the activities proscribed by FACE has decreased the availability of abortion-related services in the national market and caused women seeking services and physicians providing services to travel interstate. Accordingly, the activity proscribed by FACE has a substantial effect on the interstate commerce of reproductive health services.

The legislative record establishes that a shortage of abortion-related services exists in this country that is exacerbated by the misconduct proscribed by FACE. See S. Rep. No. 103-117, at 17. Only 17 percent of counties in the United States have an abortion provider. See H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. This leaves 83 percent of counties without a physician willing to perform

18

abortions. See S. Rep. No. 103-117, at 17 & n.29. The shortage is most severe in rural counties because reproductive health clinics are located primarily in metropolitan areas, leaving women residing in rural areas without a provider of these services. See H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. In a rural community, only one provider usually exists in a large geographical area, thus making it a preferred target for anti-abortionists because elimination of that provider eliminates abortion services for all women in that area. See H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.

The shortage of abortion-related services has resulted in a national market for these services because many of the patients must engage in interstate commerce by traveling from one state to obtain reproductive health services in another. Testimony and evidence before Congress showed that substantial numbers of women travel interstate to seek the services of reproductive health clinics. See  S. Rep. No. 103-117, at 31; H.R. Rep. No. 103-603, at 6, U.S.C.C.A.N., at 703. Many patients travel over 100 miles to their appointments. See S. Rep. No. 103-117, at 17 & n.29. For one example, Ms. Sylvia Doe, who testified before Congress that after learning her baby suffered from a permanent disability that would cause its early death, traveled from Virginia to a clinic in Kansas capable of performing the procedure she required. See H.R. Rep. No. 103-306, at 7-8, U.S.C.C.A.N, at 704-5. Furthermore, the Senate found that 44 percent of the patients treated at a clinic in Wichita, KS, are from out of state. See S. Rep. No. 103-117, at 31. Congress's determination that reproductive health services are an interstate market was well supported by the testimony presented to the committees. See Bird , 124 F.3d at 668-79 (setting forth a summary of testimony).

In addition, reproductive health clinics employ a national market of physicians and staff. Because of the shortage of physicians willing to perform abortions in the age of clinic violence, doctors employed at reproductive health clinics often travel across state lines to provide abortion services. See S. Rep. No. 103-117, at 31 & n.46. "Some doctors traveled to several states, some for hundreds of miles, to perform abortions at clinics which had no physicians of

19

their own." Id. For example, in South Dakota the only physician who performs abortions commutes from Minnesota and provides abortion services in Minnesota, Montana, North Dakota, and parts of Canada. See id. at 16-17 & n. 29, 31.

The Senate Committee also concluded that reproductive health clinics engage in interstate commerce. The Committee reported that

> Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the stream of interstate commerce.

S. Rep. No. 103-117, at 31. Thus, Congress found that a national market existed for reproductive health services because of the shortage of physicians who provide abortion-related services, that reproductive health clinics often employ physicians from outside the state in which they are located, and reproductive health clinics themselves are engaged in interstate commerce.

Finally, Congress determined that the conduct prohibited by FACE inhibits and prohibits the delivery of reproductive health care services in the national market. Based on the testimony and evidence before it, Congress found that the clinic blockades, the threats against employees, and the other violent and obstructive activities prohibited by FACE have the single goal of eliminating the practice of abortion by closing abortion clinics. See S. Rep. No. 103-117, at 11; H.R. Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. Congress also, based on the evidence before it, rationally determined that the national movement was succeeding. The House Report stated that the "campaign of violence has led to death, injury, harassment, fear, and thousands of arrests all across the nation. It has resulted, as intended, in access to the constitutionally protected right to choose being denied to thousands of women nationwide against their will." H.R. Rep. No. 103-306, at 6, U.S.C.C.A.N., at

20

703. The Senate Report states that clinic blockades and violent protests proscribed by the Act have "a significant adverse impact not only on abortion patients and providers, but also on the delivery of a wide range of health care services." S. Rep. No. 103-117, at 14. The effect of the violence forced "clinics to close, caused serious and harmful delays in the provision of medical services, and increased health risks to patients." Id.

Furthermore, when FACE was enacted, millions of dollars of damage had been caused to these facilities by the clinic blockades. See H.R. Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The damage caused to reproductive health care facilities eliminates on a temporary or permanent basis the reproductive health care services that are provided by the facilities. See id. at 9, U.S.C.C.A.N., at 706. Thus, the activities proscribed by FACE inhibit the operation of entities that are directly engaged in interstate commerce.

Congress explicitly noted the link between the abortion-related violence and the shortage of physicians willing to perform abortions. A number of physicians and health care personnel have been intimidated by the threats of violence made to them and their families and have stopped providing their services, thus contributing to the shortage of providers. The House Committee found that rural clinics and doctors have become the preferred targets for abortion foes because elimination of that single provider effectively eliminates service for many women. See id. at 8, U.S.C.C.A.N., at 705. The Senate Committee also reported that the violence "has . . . taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers." S. Rep. No. 103-117, at 14. Specifically, "some providers have succumbed to the intimidation and threats." Id. at 17. At least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group, two doctors stopped working in 1993 after receiving death threats, and since Dr. Gunn, an abortion-provider in Florida, was shot in 1993, at least eight more doctors have stopped offering abortion services. See id. at 16-17. The House Committee also reported that the shortage of

21

abortion providers is "at least partially attributable to the violence and intimidation described in this report. Doctors understandably are leaving the field, and new graduate[s] have little desire to enter the field even as part of a wider obstetrics/gynecology practice." H.R. Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.

Moreover, although under Lopez Congress may regulate intrastate activity that in the aggregate has an effect on interstate commerce, the anti-abortion movement itself whose conduct is regulated by FACE is national in scope. Congress found that many of the activities were organized and directed across state lines. See S. Rep. No. 103-117, at 13, 14 & n.26; H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. The House reported that a national strategy has emerged, orchestrated by anti-abortion leaders. See H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the conduct regulated by FACE was beyond the control of local and state authorities. Thus, when it enacted FACE, Congress sought to regulate a truly national problem.

In sum, due to the acute shortage of abortion-related services in this country and the resulting national market for abortion-related services, the conduct proscribed by FACE -- the commission of blockades and other acts of violence -- has a substantial effect on the availability in interstate commerce of reproductive health services. The effect of the misconduct is to deter physicians from providing further services and temporarily and permanently to shut down reproductive health clinics, thus forcing large numbers of women to travel across state lines to obtain services. We, thus, must agree with the testimony before the Senate that,

> the shift of demand for abortion services from those areas where clinic access is obstructed to those areas where it is not represents the sort of interstate commerce effect that is beyond the effective control of any one state and is accordingly a proper subject for congressional regulation under the Commerce Clause.

22

Bird, 124 F.3d at 681 (quoting Senate Hearings, at 97
(statement of Professor Tribe)).4

Our determination that FACE regulates activity that has
a substantial effect on interstate commerce is supported by
Supreme Court cases young and old. Recently, in Jones v.
United States, ___ U.S. ___, 120 S. Ct. 1904, 1909 (2000),
the Supreme Court considered whether the arson of an
owner-occupied residence not used for any commercial
purposes qualified as arson of property used in interstate
commerce within the meaning of the federal arson statute.
The Court held that arson of a private dwelling was beyond
the reach of federal commerce power to criminalize arson.
See id. at 1911. To determine, however, whether the arson
of a particular facility is a commerce-affecting act, the
Court instructed that "[t]he proper inquiry .. . is into the
function of the building itself, and then a determination of
whether that function affects interstate commerce." Id. at

_____

4. We respectfully register our disagreement with the dissent. The
dissent characterizes the connection between clinic blockades and
interstate commerce as the same attenuated "but-for-causal chain"
between gender-motivated crimes and interstate commerce rejected by
the Court in Morrison. This view narrowly focuses on the activity
regulated by FACE in the abstract and fails to acknowledge the national
market for reproductive health services in this country. Congress
determined that the abortion provider shortage in the United States has
resulted in a national market for abortion services. In this context,
abortion-related violence committed to close down a reproductive health
clinic or deter a woman from accessing its services has a direct effect on
interstate commerce. Abortion-related violence in the specific context of
a national market for reproductive services simply cannot be compared
to gender-motivated crime -- the activity regulated by VAWA. Given the
national market for abortion services, the nexus between the activity
regulated by FACE and interstate commerce is direct.

The dissent also relies on a comparison of anti-abortion violence to
rape, robbery, and trespass to conclude that anti-abortion violence is a
local problem properly regulated by the anti-abortion movement. This
comparison fails to acknowledge the motivation of the anti-abortion
movement. Although the individual tactics of anti-abortion activists may
have similar characteristics as common law crimes, the comparison ends
there. As Congress found, the anti-abortion movement targets
specifically a branch of commerce that operates in a national market.
Hence, anti-abortion violence is a national, rather than a local, problem.

23

1910. Here, the facilities blockaded and temporarily or permanently closed by the activities of anti-abortion protestors are businesses that provide reproductive health services and are directly involved in interstate commerce. Thus, under the functionality test provided in Jones, the blockading and destruction of reproductive health clinics, just like the arson of a commercial building, is a commerce-affecting activity and therefore properly regulated by Congress.

In Atlanta Motel v. United States, 379 U.S. 241, 250-58 (1964), the Supreme Court upheld Title II of the Civil Rights Act of 1964 as a proper regulation of an activity that affects commerce. The holding was premised on the conclusion that discrimination in restaurants results in serving fewer customers, therefore adversely affecting interstate commerce. Here, given Congress's specific findings that there exists a national market for reproductive health services suffering from a shortage in services, the effect of temporarily and permanently shutting down reproductive health clinics that are often frequented and staffed by people crossing state lines has a direct effect on interstate commerce under the reasoning presented in Atlanta Motel.

In sum, we conclude that the activity regulated by FACE is economic in nature. We further determine that due to the national nature of reproductive health services and anti-abortion protests, the civil penalty provision is within the boundaries of Congress's power to regulate interstate commerce. Applying the deference that is due Congress's findings, see Parker, 108 F.3d at 30-31, we further conclude that, unlike the statutes reviewed in Lopez and Morrison, FACE regulates conduct that Congress had a rational basis to conclude has a direct and substantial effect on interstate commerce. We hold, therefore, that FACE falls within the scope of congressional authority under the Commerce Clause as a legitimate regulation of activity having a substantial effect on interstate commerce.

B. First Amendment.

Finally, we join the decisions of the courts of appeals that FACE does not regulate speech and expression protected by the First Amendment. See Hart, 212 F.3d at 1071-73;

24

United States v. Balint, 201 F.3d 928, 934–36 (7th Cir. 2000); Weslin, 156 F.3d at 296–98; United States v. Wilson, 154 F.3d 658, 662–64 (7th Cir. 1998), cert. denied, 525 U.S. 1081 (1999); Hoffman, 126 F.3d at 588–89; Bird, 124 F.3d at 683–84; Terry, 101 F.3d at 1418–22; Soderna, 82 F.3d at 1374–77; Dinwiddie, 76 F.3d at 921–24; Cheffer, 55 F.3d at 1521–22. These courts have thoroughly addressed the arguments presented by Defendants in this case and we are in full agreement with their decisions. For this reason, we do not expound on our analysis of these claims.

Defendants first argue that FACE is a view-point based restriction on speech and expressive conduct that is protected under the First Amendment. FACE is not view-point based. The language of the statute and the legislative history demonstrates that FACE governs all individuals and groups that obstruct the provision of reproductive health services and religious worship. The purpose of FACE was to protect clinics, their staff, and patients from the harm suffered when their right to provide and receive reproductive health services was interfered with. The law applies equally to all who interfere with the provision of these services, regardless of the motivation for the conduct. See Weslin, 156 F.3d at 296–97; Dinwiddie, 76 F.3d at 923; see also Pro-Choice Network of Western New York v. Schenck, 67 F.3d 377, 386 (2d Cir. 1995) (en banc), aff 'd in part, 519 U.S. 357 (1996) (holding that because the purpose of an injunction enjoining a group of anti-abortion protestors was to prevent the harm that prospective patients would suffer if the anti-abortionists' activities continued, the injunction was content neutral). Thus, Congress did not pass FACE because of disagreement with the message of anti-abortionists. Accord Hill v. Colorado, 120 S. Ct. 2480 (2000) (holding Colorado law that makes it unlawful for any person within 100 feet of a health care facility's entrance to knowingly approach within eight feet of another person without that person's consent is a content-neutral restriction). Because FACE prohibits conduct regardless of the view-point of the actor, FACE does not discriminate on the basis of content.

Furthermore, FACE, which is view-point neutral, governs conduct not speech. See Terry, 101 F.3d at 1418–19;

25

5. Defendants also argue that because the Attorney General described the actions of lawful protesters in its appellate brief, FACE, as applied in this case, is unconstitutionally vague and overbroad. This argument is without merit. Hoffman, 126 F.3d at 588; Cheffer, 55 F.3d at 1521. By its very terms, FACE regulates "force," "threat[s] of force," or "physical obstruction." 18 U.S.C. S 248(a). Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message. See Wilson, 154 F.3d at 663; Terry, 101 F.3d at 1418-19. Although the conduct may have "expressive components," this does not exempt it from governmental prohibition. Weslin, 156 F.3d at 297. We hold that FACE is a valid restriction of conduct that has an expressive component under the three-part test in United States v. O'Brien, 391 U.S. 367, 376-82 (1968). FACE serves the important governmental interest in ensuring public safety and a woman's right to seek reproductive health services; this interest is unrelated to the suppression of free speech; and FACE is narrowly tailored to meet these ends. See Weslin, 156 F.3d at 297-98; Terry, 101 F.3d at 1419-20. FACE is therefore constitutional under O'Brien .
Accordingly, we hold that FACE is constitutional under the First Amendment.[5]

CONCLUSION

Therefore, we conclude that compensatory statutory damages under FACE are properly awarded per violation and jointly and severally among defendants who participated in the violation. Furthermore, we join our sister circuits and hold that FACE is a constitutional exercise of Congress's commerce power and does not violate the First Amendment. The District Court is affirmed.

26

WEIS, Circuit Judge, Dissenting.

Were I to reach the damages issue in this case, I would agree with the majority's conclusion that defendants are liable on a joint and several basis per incident, and not per individual. Obviously, if the government had sought actual damages, it would have been restricted to recovering an amount proven at trial, and that sum could be recovered only once. The fact that Congress provided for statutory damages as an alternative to establishing the actual loss does not change the nature of the compensation, nor make it cumulative.

However, I differ with the majority in its conclusion that FACE survives constitutional scrutiny. I am aware that seven Courts of Appeals have upheld the constitutionality of the Act. Some of these decisions were made over dissents arguing that FACE could not be sustained under the analysis in United States v. Lopez, 514 U.S. 549 (1995). Although the Courts of Appeals opinions considered Lopez, they essentially treated it as a narrow holding that did not affect measures such as FACE.

Doubts that Lopez had application beyond its unique factual setting, however, were dissipated by the expansive holding in United States v. Morrison, 120 S. Ct. 1740 (2000). There, the Court revisited the question of Congress' power under the Commerce Clause to legislate on matters traditionally within the province of the States. Setting aside portions of the Violence Against Women Act, the Court wrote that "[w]e accordingly reject the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local." Id. at 1754. Continuing, the Court said, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." Id.

Together, Lopez and Morrison mandate limits to the federalization of local crime under the aegis of the Commerce Clause. FACE, like the Gun-Free School Zones

27

Act and the Violence Against Women Act, is an example of congressional intrusion into criminal law traditionally within the province of the States. These statutes are similar in that "neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute[s] has an evident commercial nexus." Lopez, 514 U.S. at 580 (Kennedy, J., concurring).

Considered alone, these statements clearly raise the likelihood that FACE is unconstitutional. Upon more detailed review, it becomes clear that Morrison permits no other conclusion.

As the majority here observes, the Supreme Court has identified three categories of activities that Congress may regulate under the Commerce power: first, the use of channels of interstate commerce; second, the instrumentalities of interstate commerce or persons or things in interstate commerce, even though the threat may come only from intrastate activity; and third, activities that substantially affect interstate commerce. Morrison, 120 S. Ct. at 1749. No contention has been made that thefirst category is involved here, and the Courts of Appeals that have considered the constitutionality of FACE have generally upheld the Act under the third category. For this reason, I will begin with a discussion of that point.

I. Regulation of Activities

Having a Substantial Relation To Interstate Commerce

In determining whether Congress may properly regulate an activity under the third Commerce Clause classification, Lopez and Morrison present considerations that can be distilled into the following four questions:

> 1) Is the activity of an apparent commercial character;
>
> 2) Does the statute contain an express jurisdictional element that may establish a connection with interstate commerce;
>
> 3) Are there congressional findings that illuminate a reasonable legislative judgment that the activity

28

substantially affects interstate commerce, although such an effect is not "visible to the naked eye"; and

4) Is there a link between the activity and a substantial effect on interstate commerce that is not so attenuated that the federal-state balance is destroyed?

See Morrison, 120 S. Ct. at 1749-52 & n.4; Lopez, 514 U.S. at 559-68. These considerations will be examined in turn.

A. The Activity is Not Commercial

FACE is drafted to prohibit specific conduct outside reproductive health clinics. It provides in relevant part:

(a) Prohibited activities. -- Whoever --

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;

. . . .

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services . . .

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c) . . . .

18 U.S.C. S 248.

The services provided by abortion clinics are clearly commercial in nature, conducted as they are in exchange for money. But these services are not the activities targeted by the legislation. FACE prohibits third parties from interfering with patients and staff entering abortion clinics, as well as from inflicting damage to the property itself. By its plain language, the statute is directed against the conduct of those external to a clinic's operations.

As the proscribed activity, a protestor's conduct does not involve a purchase, sale, or any exchange of value in return

29

for the rendering of a service, and cannot in any sense be deemed economic or commercial in character. Although blockades may reduce a clinic's revenue, the prohibited conduct is fundamentally criminal in nature and does not fit easily within the category of commercial activity.

The fact that criminal conduct may also have financial effects does not transform that activity into one commercial in nature. Murder and robbery have monetary consequences, but that does not transform criminal codes into commercial regulation. Morrison made it clear that the nature of the activity to be restricted is determined by an examination of the conduct itself, and not by such external factors as financial effects, which are one step removed from the statute's focus. Morrison, 120 S. Ct. at 1750.

In both Lopez and Morrison, thefinancial effects of the prohibited conduct were not disputed. Justice Breyer outlined in his Lopez dissent the "obvious" links between the economy and gun violence. Lopez, 514 U.S. at 619-22 (Breyer, J., dissenting). Justice Souter's dissent in Morrison cited a Senate report from the legislative history that estimated the impact of violent crimes against women to be, at minimum, $3 billion annually. Morrison, 120 S. Ct. at 1762 (Souter, J., dissenting). The Court nonetheless concluded in Lopez that the Gun-Free School Zones Act was "a criminal statute that by its terms has nothing to do with `commerce' or any sort of economic enterprise," Lopez, 514 U.S. at 561, and said in Morrison that"[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." Morrison, 120 S. Ct. at 1751.

It is apparent that the Court examined the prohibited conduct without reference to its economic effects. Courts reviewing FACE should employ a similarly disciplined analysis.

When considering the limits of congressional power, the Court has adopted a "practical conception of commercial regulation." Lopez, 514 U.S. at 574 (Kennedy, J., concurring); see also Morrison, 120 S. Ct. at 1750 (quoting Lopez). But to sustain FACE, courts must reject that concept. The statute does not resemble a commercial regulation, but instead a typical exercise of a state's police

power: prohibiting trespass, intimidation, and violence; and providing criminal sanctions as well as injunctions.

The threshold inquiry articulated in Lopez and repeated in Morrison is consistent with the Court's prior Commerce Clause decisions. As the Court wrote, "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." Morrison, 120 S. Ct. at 1751. Two cases cited by the Court in that context provide a useful contrast to the present dispute.

In Heart of Atlanta Motel, Inc. v. United States , 379 U.S. 241, 261-62 (1964), and the parallel case of Katzenbach v. McClung, 379 U.S. 294, 305 (1964), the Court upheld legislation requiring hotels and restaurants to make accommodations open to black patrons as well as white. The regulated enterprises were clearly within Morrison's definition of economic activity. It was the hoteliers and restauranteurs themselves, in the operation of their business, who had to alter their conduct in order to comply with the law. The legislation did not apply to third parties whose conduct may or may not have been commercial.

FACE does not in any way control the operation of a clinic in its procedures or selection of patients. That distinction, as well as the lack of a jurisdictional element, separates FACE from the Civil Rights legislation upheld in Heart of Atlanta and Katzenbach.

To cavalierly dismiss the traditional distinctions between criminal and commercial conduct is to "downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis." Morrison, 120 S. Ct. at 1750. Both Lopez and Morrison made the inquiry into commercial character a key element to their holdings. In the present case, the only reasoned answer to the question of whether the blockading is commercial in character must be in the negative.

B. The Act Contains No Jurisdictional "Hook"

A jurisdictional element in a statute serves to define the limits of the regulated activity. Including such a

31

requirement assures that the legislation is directed toward a defined scope of conduct, one more apt to be within the reach of the commerce power granted to Congress. See United States v. Bishop, 66 F.3d 569, 594 (3d Cir. 1995) (Becker, Ch.J., concurring in part and dissenting in part). A statutorily required proof of connection with interstate commerce mandates a case-by-case inquiry.

Stressing the redemptive power of such an element, the Court in Lopez discussed United States v. Bass, 404 U.S. 336 (1971), where it circumspectly read federal gun legislation to require a nexus with interstate commerce. Lopez, 514 U.S. at 562. In Bass, the Court chose to avoid a potential constitutional infirmity in this fashion because " `unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.' " Id. (quoting Bass, 404 U.S. at 349). Similarly, Jones v. United States, 120 S. Ct. 1904, 1908, 1910 (2000), carefully interpreted an arson statute so as not to apply to all private residences and thus avoided the constitutional issues, despite interstate connections in the forms of a mortgage, an insurance policy and the use of natural gas.

But in FACE, there is no such ambiguity. Indeed, it appears that Congress simply sought to extend a"remedy over a wider, and more purely intrastate, body of violent crime." Morrison, 120 S. Ct. at 1752. Without a jurisdictional clause to provide a case-by-case limitation, the Act's reach becomes vulnerable to a Constitutional challenge.

Because FACE lacks the jurisdictional element, the government in this case was not required to establish any connection with interstate commerce. It was not necessary to show that interstate travel was hindered or affected, that equipment or furnishings were purchased in interstate commerce, or that any of the other jurisdictional indicia that have been used in statutes that have passed constitutional muster were satisfied. All that the government had to show was that a clinic, even if a purely local enterprise, was being blockaded. The prosecutor thus had almost unlimited discretion to intervene in a purely local disturbance.

32

The preservation of the constitutional allocation of power between state and federal governments is a serious concern for both the legislative and judicial branches. Including a jurisdictional requirement in a statute is one way Congress can demonstrate that it recognizes this important issue and has acted in light of that knowledge.

The absence of a jurisdictional clause in FACE is a fatal flaw, one that is not cured by the congressionalfindings that will be discussed next.

C. The Legislative Findings Are Inadequate

Unlike Lopez, but like Morrison, FACE's legislative history contains congressional findings. As a result of hearings, Congress alleged in Committee reports and in floor debates that patients and doctors travel interstate for abortions; that local authorities were sometimes unable to control violence at abortion clinics; and that obstructionist tactics had caused losses in the millions of dollars, caused clinics to close, and had intimidated physicians as well as patients. Based on anecdotal evidence, Congress decided that federal intervention authorized by the Commerce Clause and section 5 of the Fourteenth Amendment was appropriate.

On several occasions, we have said that congressional findings are entitled to judicial deference and that it is not our role to " `second-guess the legislative judgment of Congress.' " United States v. Parker, 108 F.3d 28, 30 (3d Cir. 1997) (quoting Bishop, 66 F.3d at 577). Accordingly, all that was required of a reviewing court was to ensure that Congress had a rational basis for its legislation. Id.

However correct that approach may be in other settings, it can no longer be said that such substantial deference is due in cases assessing the limits of congressional power under the Commerce Clause. In Morrison, the Court stated that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." Morrison, 120 S. Ct. at 1752. Whether the effect upon interstate commerce is substantial enough to make Congress' exercise of power under the

33

Commerce Clause appropriate "is ultimately a judicial rather than a legislative question." Id.

As the basis for concluding that blockades have a substantial effect upon interstate commerce, Congress reasoned that obstructions that deter patients from going to a clinic caused diminished business for the enterprise. In some cases, when clinics closed, women were required to travel, perhaps interstate, to obtain the services of another establishment.

This is the very same "but-for causal chain" of logic that the Court explicitly rejected in Morrison. Id. at 1752-53. If every attenuated effect upon interstate commerce stemming from an occurrence of violent crime satisfied the substantial effects test, then Congress could "regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." Id.

The opinions of the Courts of Appeals that have upheld FACE all rely heavily on the legislative history for concluding that a substantial effect on interstate commerce existed. See United States v. Weslin, 156 F.3d 292, 296 (2d Cir. 1998); United States v. Bird, 124 F.3d 666, 678 (5th Cir. 1997); Terry v. Reno, 101 F.3d 1412, 1415-16 (D.C. Cir. 1996); United States v. Dinwiddie, 76 F.3d 913, 920-21 (8th Cir. 1996); United States v. Wilson, 73 F.3d 675, 681 (7th Cir. 1995); Cheffer v. Reno, 55 F.3d 1517, 1520-21 (11th Cir. 1995); American Life League v. Reno , 47 F.3d 642, 647 (4th Cir. 1994). But these decisions are undercut by Morrison. With the asserted justifications constitutionally infirm, the legislative history does little to demonstrate a reasonable congressional judgment that the prohibited activity substantially affects interstate commerce.

D. Any Link is Too Attenuated

As was said in Lopez, "[i]n a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether

34

the exercise of national power seeks to intrude upon an area of traditional state concern." Lopez, 514 U.S. at 580 (Kennedy, J., concurring). Any supposed link between the proscribed conduct in FACE and interstate commerce, if one exists, would be so attenuated that it could be used to also justify a general federal police power.

Even assuming that some of the surgical instruments, medications, furnishings and equipment were in interstate commerce at some point, such a connection is so nebulous that it provides no useful boundary under the Commerce Clause. According to Morrison, allowing such remote factors to govern constitutional limitations would allow Congress to "completely obliterate the Constitution's distinction between national and local authority." Morrison, 120 S. Ct. at 1752.

Persons seeking to block access to abortion clinics may be a national problem, but in that sense, rape, robbery and trespass present national concerns as well. Being a mere commonality of the several States does not justify federal regulation of these matters under the auspices of interstate commerce.

The conduct at issue here -- blocking access to a building and verbally intimidating those who attempted to enter -- is a quintessentially local problem. Despite that obvious and inescapable fact, the federal government chose to use its resources where they were neither required nor appropriate.

Because the prohibited activity has no commercial character and no jurisdictional element need be proved, the statute as drafted impermissibly extends federal jurisdiction over conduct that is purely and simply intrastate and has no relationship in any substantial manner to interstate commerce. Without a jurisdictional prerequisite, FACE leaves the federal government free to intrude into a state's sovereign duty to maintain order in any abortion clinic-related disturbance, no matter how trivial.

Contrary to the congressional findings, here there was no abdication of responsibility by state authorities. A state court had issued an injunction against obstructing entry to the clinic. On each of the three occasions when the conduct occurred, the local police intervened, arrested protesters,

and filed state criminal charges. All of the blockades were controlled by local authorities, including the last one, which caused the local police to seek assistance from neighboring municipalities. The only reported injuries were the result of one demonstrator kicking and head-butting a police officer.

From the standpoint of local law enforcement personnel, the conduct that FACE addresses is not extraordinary, but is akin to disturbances following a high school game between bitter rivals, where fans demonstrate their loyalty in mass unruly gatherings. Celebrations by fans of Super Bowl champions frequently require intervention by city police to maintain order and protect property (some of it undoubtedly in interstate commerce). Near riots at rock concerts by performers who have traveled interstate are routinely controlled by local police forces. Many of the same arguments used to justify FACE could be used to federalize criminal conduct of this nature, despite the competence state authorities have demonstrated over the years. 1

It is difficult to understand why the federal government invoked FACE when local authorities had the situation well in hand. Duplication of state and federal injunctions wastes judicial resources and leads to uncertainty and confusion. Moreover, overlapping of enforcement authority is detrimental to the federal system and the liberties it secures. "[C]itizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. `Federalism serves to assign political responsibility, not to obscure it.' " Lopez, 514 U.S. at 576-77 (Kennedy, J., concurring) (quoting FTC v. Ticor Title Ins. Co., 504 U.S. 621, 636 (1992)). When overlapping occurs, the lines drawn by federalism are blurred and the "resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power." Id. at 577 (Kennedy, J., concurring).

_____

1. Where state officials are unable to adequately control disturbances with their own resources, 42 U.S.C. S 10501 allows officials to petition the Attorney General for assistance from the federal law enforcement community.

FACE is a glaring example of the federalization of local criminal law that is fatally flawed in its implementation because it regulates activities with no commercial character. The statute contains no jurisdictional element which might cabin its operation within the confines of the Commerce Clause, and the congressional findings fail to provide the necessary justification for federal intrusion into local law enforcement.

II. Instrumentalities of Interstate Commerce

The government also argues that FACE may be sustained under the second category noted by the Supreme Court-- protection of the instrumentalities of interstate commerce or persons or things in interstate commerce. The Court of Appeals in United States v. Bird, 124 F.3d 667, 674 (5th Cir. 1997) concluded that FACE was not sustainable under this second category because no evidence was submitted at trial to support such a conclusion. The Court in Terry v. Reno, 101 F.3d 1412, 1415 (D.C. Cir. 1996) simply noted that only the third category was relevant to the case before it.

The Court of Appeals in United States v. Dinwiddie, 76 F.3d 913, 919-20 (8th Cir. 1996), considered this second category, observing that the clinic in that case was located in a metropolitan area straddling two states. Because of this, a number of patients and staff members did not live in Missouri where the clinic was located, and therefore, traveled interstate to reach it. Id. On that basis, the court concluded that the statute protected people and business in interstate commerce and so was within Congress' power to enact under the second category. Id. 2

_____

2. It is interesting, but not determinative, that in Dinwiddie, the record established the interstate travel of a doctor and some patients. No such findings were made in the case before us. In any event, the Dinwiddie evidence would not cure the facial deficiency in the text of the Act itself.
As a criminal statute, it must give notice of the nature of the conduct proscribed, United States v. Harriss, 347 U.S. 612, 617 (1954), including jurisdictional facts that must be proved. The fact that the prosecution produces evidence that could satisfy a hypothetical jurisdictional element cannot cure the lack of the material element in the statute itself.

Dinwiddie, however, failed to consider the significance of the lack of a jurisdictional hook in FACE, although such absence was a factor in Lopez. It is noteworthy that the two cases cited by the Dinwiddie court to support its holding that the clinic was "in interstate commerce" were based on statutes that did contain jurisdictional limitations. E.g., United States v. American Bldg. Maint. Indus., 422 U.S. 271, 275-76 (1975) (Clayton Act); United States v. Robertson, 514 U.S. 669, 670 (1995) (RICO).

I am not persuaded that a purely local commercial service that is frequented by nearby but out-of-state patrons is within the scope of the Commerce Clause without the saving grace of a jurisdictional clause. See Morrison, 120 S. Ct. 1752 n.5.

It is significant that in Lopez, the cases cited in support of the commerce power under the second category involved such matters as the Safety Appliance Act as applied to railroad cars used in intrastate and interstate commerce, Southern Ry. Co. v. United States, 222 U.S. 20, 24 (1911), and fixing intrastate railroad fees that affect interstate rates. Shreveport Rates Cases, 234 U.S. 342, 345 (1914). Other examples cited by the Supreme Court include destruction of an aircraft or thefts from interstate shipments. Perez v. United States, 402 U.S. 146, 150 (1971). None of these situations approaches the broad sweep of FACE, which, it must be said again, lacks any jurisdictional limitation to restrict its application to those matters demonstrably in interstate commerce.

III. Fourteenth Amendment

The government also attempts to sustain the statute as a valid exercise of congressional power under the Fourteenth Amendment. Morrison provides a short answer to that contention. The Fourteenth Amendment applies to the states, and like the Violence Against Women Act, FACE is directed at private conduct where there is no indication of state action. Morrison, 120 S. Ct. at 1756. FACE, therefore, cannot be sustained under the Fourteenth Amendment.

38

I conclude that FACE is unconstitutional under both the Commerce Clause and the Fourteenth Amendment. The judgments in this case should be set aside.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit