**UNITED STATES of America,**
**Plaintiff,**

v.

**Frank Lafayette BIRD, Defendant**

**No. H–03–0163.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 18, 2003.

Financial Litigation, U.S. Attorney's Office, Southern District of Texas, Richard Harris, Office of U.S. Attorney, U.S. Probation—H, Pretrial Services—H, Houston, TX, for U.S. Attorneys.

Frank Lafayette Bird, Jr., In Custody, Federal Public Defender, Brent Evan Newton, Asst. Fed. Pub. Defender, Houston, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

Before the Court is the defendant, Frank Lafayette Bird's motion to dismiss the indictment against himself based on his contention that the Freedom of Access to Clinic Entrance ["FACE"] Act is unconstitutional. *See* Title 18 U.S.C. § 248. Also before the Court is the government's opposition and response to the defendant's motion. The Court has reviewed the motion, response and supporting arguments and is of the opinion that the defendant's motion is meritorious and should be granted.[1]

## II. THE INDICTMENT AND FACTUAL BACKGROUND

A federal grand jury returned a one count indictment against the defendant charging him with intentionally damaging and destroying the property of Planned Parenthood. The government charges that the defendant drove a van through the front door of Houston Planned Parenthood facility in violation of § 248, specifically, subsections (a)(3) and (b)(2).[2] Planned Parenthood is an organization/facility that provides reproductive health services.

## III. CONTENTIONS OF THE PARTIES

### a) The Defendant's Contentions

Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. *United States v. Morrison,* 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). It is the defendant's contention that Congress, in enacting § 248, relied upon its "perceived authority under the Commerce Clause, U.S. Const. Art. 1 § 8, and on § 5 of the 14th Amendment" to the federal Constitution. *See* Pub.L. 103–259, § 2. It is the defendant's contention that Congress exceeded its authority, thereby rendering § 248 unconstitutional under both the Commerce Clause and the Fourteenth Amendment to the federal Constitution.[3]

1. Although six (6) Circuit Courts [including the 5th Circuit] have found the FACE Act to be constitutional as a legitimate exercise of Congress' authority under the Commerce Clause, the decisions predate *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Also, each opinion appears to overlook the fact that there is no larger congressional economic regulatory scheme to which the Act is linked. All of the economic activity was private in nature. Thus, the Court desires that the Fifth Circuit reexamine its precedent in *United States v. Bird,* 124 F.3d 667 (5th Cir.1997) *cert denied,* 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998) *("Bird I")* and speak to the constitutional dilemma created by *Morrison.* In *United States v. Kung–Shou Ho,* 311 F.3d 589 (5th Cir.2002) it appears that the Court recognized the fallacy in the *Bird I* precedent. The Circuit stated that: "We recognize that Bird seems to contradict this conclusion [that the history of the Commerce Clause concerns regulation of intrastate activity only when that activity is economic in nature]." 311. F.3d at 600.

2. The defendant was charged in 1996, with violating 18 U.S.C. § 248. *See Bird I.* Bird was found guilty of throwing a bottle at Dr. Theodore Herring's vehicle at or near an abortion clinic. He was also heard to yell that he was going to kill the doctor. The bottle shattered the windshield; however, no injuries were sustained. Bird was arrested, charged, convicted and punished for violating the FACE Act.

3. The government does not address the defendant's Fourteenth Amendment claim. However, it is unnecessary because there is no state action for which § 5 would relate. *See Morrison,* 529 U.S. at 621, 120 S.Ct. 1740, citing to *Virginia v. Rives,* 100 U.S. 313, 318, 10 Otto 313, 25 L.Ed. 667 (1879).

#### b) *The Government's Contentions*

The government argues serially that the defendant's contentions concerning the constitutionality of § 248 were previously addressed in *Bird I*. There, the government argues, Bird made similar arguments concerning the constitutionality of § 248. And, in spite of the defendant's arguments, the court upheld the constitutionality of the statute and affirmed Bird's conviction. *Id.* at 682.

Next, the government argues that congressional passage of § 248 was a valid exercise of Congress' Commerce Clause power under the federal Constitution. In support of its validity argument, the government asserts that: (a) § 248 involves an "economic activity"[4]; (b) a jurisdictional element is not a necessary component of a constitutional statute, citing to *Groome v. Jefferson*, 234 F.3d 192 (5th Cir.2000) [*Groome* draws from *United States v. Morrison*, 529 U.S. 598, 611–12, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) for its authority on this point]; (c) a court, making a statutory constitutional assessment must defer to a legislative determination so long as the legislative determination is a rational one; and, (d) § 248 has more than an attenuated affect on interstate commerce. Finally, the government argues that decisions made by other Circuit Courts, since the *Morrison* decision, support the constitutionality of § 248. In support of this argument, the government cites to *Scheidler v. National Organization of Women*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003); *Norton v. Ashcroft*, 298 F.3d 547 (6th Cir.2002) *cert denied*, —— U.S. ——, 123 S.Ct. 1003, 154 L.Ed.2d 915 (2003); and *United States v. Gregg*, 226 F.3d 253 (3rd Cir.2000).[5]

#### c) *The Defendant's Response*

In his response to the government's contentions, the defendant argues that *Bird I* is now invalid, in light of *Morrison*, as having been "implicitly" overruled therein. The defendant also argues that the government's view, that the Supreme Court cannot implicitly invalidate an appeals court decision, is not supported by the decision in *United States v. Kallestad*, 236 F.3d 225, 228 (5th Cir.2000). Finally, the defendant argues that the government, in relying upon *Bird I* and *Kallestad*, ignores two recent post *Bird I* cases decided by the Fifth Circuit that bear upon Congress' Commerce Clause authority. *See GDF Realty Investments Ltd. v. Norton*, 326 F.3d 622, 631 (5th Cir.2003); *see also United States v. Ho*, 311 F.3d 589, 600 (5th Cir.2002).

In addressing the defendant's claim that § 248 is unconstitutional, the Court will examine in some detail the Fifth Circuit's decisions in *Bird I*, 124 F.3d 667; *Kallestad*, 236 F.3d 225; and *Ho*, 311 F.3d 589, and the Supreme Court's decision in *Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658.

### IV. A REVIEW OF *BIRD I, KALLESTAD, HO* AND *MORRISON*

#### A. *Bird I–History and Holding*

In December of 1994, the defendant, "while protesting outside the Americans Women Clinic in Houston, threw a bottle at a car driven by Dr. Theodore Herring, an abortion provider, as he attempted to enter the clinic premises." Herring was not injured when the bottle shattered the windshield of Herring's vehicle. The de-

---

4. In *Bird I*, the Circuit Court recognized that § 248(a)(1) was a criminal statute that regulated intrastate noncommercial conduct. *Id.* at 677. Thus, while the abortion business is economic in nature, the conduct of *Bird* and the activities sought to be circumscribed are not. 124 F.3d at 675–76.

5. The Court addresses the government's reliance on these cases *infra*.

fendant was charged in a one-count indictment with violating § 248(a)(1)[6] of the FACE Act, which criminalizes threats and acts of intimidation directed at providers of abortion services.

A jury returned a guilty verdict against Bird on June 12, 1995. After being sentenced, the defendant filed a notice of appeal challenging the constitutionality of the FACE Act. His challenge to the validity of the statute was presented on four (4) grounds. *Bird*, 124 F.3d 667. First, the defendant argued that § 248(a)(1) was beyond the authority granted Congress under the Commerce Clause because the statute criminalized private, noneconomic conduct, relying on the decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Next, he argued that the application of the Act caused "invidious discrimination" because it protected certain family relations while failing to protect others. Third, he argued that the Act was unconstitutionally overbroad. And finally, he argued that the Act was void for vagueness. *Bird*, at 672.

The government defended Congress' enactment as a proper exercise of its authority under the Commerce Clause. The government maintained that the "congressional findings" showed that the targeted conduct "in the aggregate" affected interstate commerce because the targeted conduct threatened to "eliminate abortion services from the national commerce." *Id* at 673. Relying in part on *Lopez*, the Fifth Circuit held that § 248 of the Act was constitutional. The court addressed the three (3) areas of permissible congressional reg-

ulation most recently pronounced in *Lopez* and rested its opinion on the third area of permissible congressional regulation.

■ Concerning the first area of permissible regulation, the court acknowledged that Congress may regulate the use of "channels" of interstate commerce. However, it found that § 248(a) did not seek to regulate the use of the channels of interstate commerce. *Bird* at 673. Specifically, the court held that the Act did not attempt to prohibit the interstate transportation of a commodity through the channels of commerce. *Id*.

The second area that Congress may regulate through Commerce Clause authority is the area of "instrumentalities" of interstate commerce, persons or things in interstate commerce even when the threat comes from intrastate activities. 124 F.3d at 673 (citation omitted). The court found that this area too, was not the basis or object of congressional regulation. Finding congressional commerce authority under the third area of permissible authority, the court held that Congress had the authority to "regulate those activities having a 'substantial relation' to interstate commerce, *i.e.*, those activities that, in the aggregate, substantially affect interstate commerce." *Id* at 674 (citing *Lopez*, 514 U.S. at 557–58, 115 S.Ct. 1624). Thus, the court held that in order for Congress to enact a statute that also regulates intrastate conduct, the regulation must be based on "an essential part of a larger regulation of economic activity in which the larger regulatory scheme could be un-

**6.** Specifically, the Act provides:
(a) ... whoever
(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with, or attempts to injury, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from

obtaining or providing reproductive health services, shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor. 18 U.S.C. § 248(a)(1) (1999)

dercut unless the intrastate activity were regulated." *Bird,* 124 F.3d at 675 (citing *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624).

The court went on to define that "larger regulation of economic activity" as a broad "class of activities" in reproductive health services that, "viewed in the aggregate ... substantially affects interstate commerce." *Id.* at 676. The aggregation principle permitted the court to amass the entirety of the commercial activity and treat it as a class of activity. And, because the interstate mass was having, what the court viewed as a substantial affect on interstate commerce, it held that § 248 was a legitimate regulation of intrastate activity. Hence, the court concluded that Bird's conduct, although intrastate and noneconomic in nature, was conduct that fell within Congress' authority to regulate under the Commerce Clause. Since Bird I, however, the Fifth Circuit addressed Congress' Commerce Clause authority in *United States v. Kallestad,* 236 F.3d 225 (5th Cir.2000).

### B. Kallestad–History and Holding

In *Kallestad,* the Circuit Court was faced with a constitutional challenge to Title 18 U.S.C. § 2252(a)(4)(B), which prohibits possession of sexually explicit depictions of minors shipped in interstate commerce. The facts peculiar to this case show that Kallestad had advertised in the Austin American Statesman newspaper for "slender female nude models." Several of

those who responded were girls 16 to 19 years of age, which fact Kallestad knew. He took photographs and made film of the girls engaged in sexually explicit conduct and in some instances made with him in his home. Kallestad was convicted and sentenced. For the first time in his Writ of Habeas Corpus [Title 28 U.S.C. § 2255], Kallestad raised the argument that Congress exceeded its authority under the Commerce Clause by enacting Title 18 U.S.C. § 2252.

The Fifth Circuit reviewed the *Lopez* decision but distinguished *Kallestad* on the basis that "the child pornography statute represents congressional regulation of an item bound up with interstate attributes and, thus, differs in substantial respects from legislation concerning possession of a firearm within a purely local school zone." (citations omitted). The Fifth Circuit went on to compare *Kallestad* to *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)[7]. In *Wickard,* the Supreme Court held that Congress' Commerce Clause authority reached Filburn, who produced wheat for his own personal consumption, because wheat was traded in an interstate market and Filburn's conduct was economic in character. 317 U.S. at 114, 63 S.Ct. at 82. Hence, Filburn's conduct, although intrastate in nature, affected Congress' authority to regulate the larger economic activity, wheat production and prices in interstate commerce.

---

**7.** *Bird* is distinguished from *Wickard,* where the regulated activity was tailored to a statute that had the primary purpose "to increase the market price of wheat" and "limit the volume thereof that could affect the market." *Wickard,* 317 U.S. at 128, 63 S.Ct. 82. Even if the activities prohibited by § 248 are considered under the aggregation theory, it does not strengthen the relationship between the statute's prohibitions and the Commerce Clause. *See Wickard,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122(1942); *Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Morri-*

*son,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Here, as in *Lopez* and *Morrison,* the analysis consists of too many inferences and leaps in constitutional logic to reach congressional authority to regulate this activity under the Commerce Clause. *See, e.g., Lopez* 514 U.S. at 643, 115 S.Ct. 1624 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.").

By analogy, the Fifth Circuit reasoned that Kallestad, like Filburn, never intended to sell his photographs and films in interstate commerce, he nevertheless, was in possession of materials that were the basis of interstate commercial child pornography. Thus, *Kallestad* rested on the view that the child pornography statute regulated "items bound up with interstate attributes..." 236 F.3d at 228.[8]

### C. *Morrison–History and Holding*

At issue in *Morrison* was the constitutionality of the Violence Against Women Act of 1994. *See* Title 42 U.S.C. § 13981(b). Section 13981(b) provides, in essentials, that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). Subsection (c) of § 13981(b) provided a civil remedy against a person "... who commits an act of violence motivated by gender..." This subsection established the jurisdictional basis for the plaintiff's, Christy Brzonkala, suit.

Brzonkala, a female student at Virginia Tech, alleged that she had been assaulted and repeatedly raped by Morrison and Crawford, members of the varsity football team at Virginia Tech. Brzonkala brought a civil suit against Morrison and Crawford under § 13981 of the Act and against Virginia Tech under Title IX of the Education Amendments of 1972. The United States joined the suit in defense of the Act as a petitioner. In defending the constitutionality of the Act, the petitioners did not contend that Congress' Commerce Clause authority arose under either of the first two *Lopez* areas of permissible Commerce Clause authority, *i.e.,* Congress' authority to regulate the use of "channels" of inter-

state commerce or to regulate and protect the "instrumentalities" of interstate commerce. Instead, the petitioners argued that § 13981 was "a regulation of activity that substantially affects interstate commerce." 529 U.S. at 609, 120 S.Ct. at 1749.

The Supreme Court set forth four relevant considerations germane to its analysis of the constitutionality of the Violence Against Women Act. The four considerations provided the framework for the Court's determination that the Gun–Free School Zones Act of 1990 [Title 18 U.S.C. § 922(q)(1)(A) ], regulated an activity that did not have a substantial effect on interstate commerce. First, the Court observed that § 922(q) was " 'a criminal statute that by its terms ha[d] nothing to do with 'Commerce' or any sort of economic enterprise.' " 529 U.S. at 610, 120 S.Ct. at 1749. Next, it noted that the statute [§ 922(q) ] did not contain an "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id* at 611–12, 120 S.Ct. at 1751.

■ The Court's third consideration pointed out that the legislative history of the Act and statute do not contain congressional findings regarding the effect that possession of a gun in a school zone will have on interstate commerce. *Id.* Finally, the Court sought a link between the regulated activity and interstate commerce. The *Lopez* decision rested in part on the fact that possession of a gun in a school zone had an "insubstantial or attenuated" affect on interstate commerce. *Ibid.* The Court went on to conclude that, like the Gun–Free School Zones Act, the Violence Against Women Act contained "no jurisdic-

---

**8.** In both cases, there was a product that was a part of a larger national economic activity that was traded in interstate commerce onto which the intrastate activity was hitched.

This aspect of *Kallestad,* according to the court, also distinguished it from *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

tional element establishing that the federal cause of action [was] in pursuance of Congress' power to regulate interstate commerce." *Id* at 613, 120 S.Ct. at 1751. Thus, the Supreme Court determined that Congress had no authority to "regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id* at 617, 120 S.Ct. at 1754.

### D. Ho–History and Holding

After *Bird I, Kallestad* and *Morrison,* the Fifth Circuit was again presented with a challenge to Congress' Commerce Clause authority under the Clean Air Act, ("CAA") §§ 112(h), 114(a). [Title 42 U.S.C. §§ 7412(h), 7414(a) ]. *See United States v. Ho,* 311 F.3d 589 (5th Cir.2002). The facts reveal that Ho was the owner of a produce supply and trucking company. He was prosecuted and convicted under § 7413(c)(1) for failure to comply with federal asbestos work practice standards and failure to give notice of his intent to remove asbestos under § 7413(c)(2)(B). The facts show that he failed to give advance notice to the Environmental Protection Agency [40 C.F.R. § 61.145(b) ] prior to removal of asbestos, which removal violated asbestos work practice standards. *Id.*

In a six (6) count indictment, Ho was charged with conspiracy to violate the CAA, failure to give notice of intent to remove asbestos, failure to comply with asbestos work practice standards, failure to notify the appropriate agency of a release of asbestos, knowingly releasing asbestos into the ambient air, and making a false and material statement to OSHA and the Department of Labor. *Id.* at 593. Ho

challenged his conviction on several grounds. He contended that the law under which he was convicted exceeded Congress' authority under the Commerce Clause, citing to *Lopez* and *Morrison* as authority. Concluding that Congress had the authority to enact the relevant CAA sections, the Fifth Circuit held that the aggregation principle applied to asbestos work practice standards. 311 F.3d at 602. Then, utilizing the *Lopez* and *Morrison* Commerce Clause reasoning, the court found that Ho's activities were commercial in nature. *Id.* And, although the asbestos work practice standards did not contain a jurisdictional element, none was necessary or decisive in the Commerce Clause analysis. *Id* at 603 n. 13, 120 S.Ct. 1740.

The court also found that the absence of congressional findings regarding any substantial effects that asbestos removal may have on interstate commerce was not an impediment to congressional regulation. *Id.* In this regard, the court concluded that such findings on the part of Congress were unnecessary to sustain the CAA provisions in question because the relationship between asbestos removal and interstate commerce was direct and apparent. *Ibid.* Although Ho's activity was isolated, and may not have posed a threat to the interstate commercial real estate market or had a detrimental environmental effect, in the aggregate, the violations did satisfy the substantial effects test. *Id* at 604, 120 S.Ct. 1740. Thus, the court concluded that Congress had properly exercised its authority under the third area [substantial relations] of the Commerce Clause. *Id.*[9]

**9.** While the Court does not follow the Fifth Circuit's view that asbestos removal in violation of the asbestos workplace standard is a threat to the interstate commercial real estate market, it does agree with the results reached. For Commerce Clause nexus, it is enough that asbestos removal fits with Congress' larger regulatory scheme to protect the public from hazardous air pollutants and emissions. Despite the fact that Ho's activity may have been minuscule in relation to the total environment, his conduct gave rise to a *Wickard* basis for regulation.

## V. A REVIEW OF SCHEIDLER, NORTON AND GREGG

Earlier, the Court mentioned that the government had cited to *Scheidler, Norton* and *Gregg* as post *Morrison* authority for upholding the constitutionality of the FACE Act. The Court will address these in turn as the Court determines that these cases are distinguishable from the case at bar.

### A. Scheidler–History and Holding

*Scheidler* was brought as a civil case and raised two issues. First, the Supreme Court addressed the issue of whether the anti-abortionists' conduct complained about amounted to extortion within the meaning of the Hobbs Act. *See* Title 18 U.S.C. § 1951.[10] Second, the Court addressed the issue of whether pro-abortionists, as private litigants, may obtain injunctive relief in a civil case under Chapter 96, the Racketeer Influenced and Corrupt Organization's Act ("RICO"). *See* 18 U.S.C. § 1964.[11] Thus, at issue were the parameters of the Hobbs Act and the RICO Statute as they might be used by private citizens to prosecute claims against persons engaging in anti-abortion activities. It is noteworthy that the constitutionality of the Hobbs Act, RICO and the FACE Act were not before the Supreme Court. Hence, the case analysis and results reached are irrelevant here. The Court turns now to *Norton* and *Gregg.*

### B. Norton and Gregg–History and Holdings

Admittedly, both *Norton* and *Gregg* are post-*Morrison* decisions that uphold the constitutionality of the FACE Act. Both cases rely in part on the reasoning and discussion by other circuit courts to one extent or another in reaching their conclusions.[12] Relying on a broad interpretation of Congress' authority under the Commerce Clause, the courts held that the FACE Act was enacted under the valid authority given Congress. Hence, the opinions rested on "substantial deference" to Congress and on "aggregation" as it creates a "substantial relationship" to interstate commerce analysis.

What is missing in *Norton* and *Gregg* and in Congress' findings is evidence that aggregation was "necessary and proper" to

---

**10.** Section 1951 is cast under Chapter 95, the Racketeering section of the title. It prohibits conduct that "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by ... extortion ..."

**11.** Subsection (b) permits the Attorney General to institute proceeding under § 1964 and seek preliminary injunctive relief. Subsection (c) permits individuals to bring a suit in federal court for injuries that result from violations of § 1962. Section 1962 involves the purchase of securities and unlawful debt collection but does not authorize injunctive relief for private citizens.

**12.** *See Gregg,* 226 F.3d at 261, where the Court aligns itself with its sister courts:

See *United States v. Hart,* 212 F.3d 1067, 1074 (8th Cir.2000); *United States v. Wes-* *lin,* 156 F.3d 292, 296 (2d Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999); *Hoffman v. Hunt,* 126 F.3d 575, 582–88 (4th Cir.1997), *cert. denied,* 523 U.S. 1136, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); *United States v. Bird,* 124 F.3d 667, 672–82 (5th Cir.1997), *cert. denied,* 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998); *Terry v. Reno,* 101 F.3d 1412, 1415–18 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); *United States v. Soderna,* 82 F.3d 1370, 1373–74 (7th Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); *United States v. Dinwiddie,* 76 F.3d 913, 919–21 (8th Cir.), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *United States v. Wilson,* 73 F.3d 675, 679–88 (7th Cir.1995), *cert. denied,* 519 U.S. 806, 117 S.Ct. 46, 136 L.Ed.2d 12 (1996); *Cheffer v. Reno,* 55 F.3d 1517, 1519–22 (11th Cir.1995).

Congress' regulation of intrastate activity because of the negative impact that anti-abortion activities were having on interstate commerce. While there are findings that doctors and patients travel from state to state because of anti-abortion activities, this finding is counter to the impact that Congress has traditionally addressed in exercising its Commerce Clause authority. In a paradoxical twist, the conduct of Bird and other anti-abortionists has had a "positive" impact on interstate commerce, albeit unintended. Persons travel to other communities and, arguably, expend money in those communities to secure the available services. There is no evidence that in passing the Act Congress intended to dissuade travel in interstate commerce by persons seeking abortion clinic services. Thus, the aggregation analysis does not support a reverse impact on interstate commerce, which commerce is not illegal. The cases that uphold the aggregation analysis as creating a substantial relationship, reveal misconduct that is intrastate and noneconomic, but involve people or products already traveling in interstate commerce. In other words, the interstate commerce already exists and is not created by the alleged criminal conduct.

## VI. ANALYSIS AND DISCUSSION

Recall that the defendant, in the case at bar, is currently charged with violating the FACE Act, § 248(a)(3) and (b)(2). Those provisions state in relevant part:

(a) Prohibited Activities.—Whoever -

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship, shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor; and.

(b) Penalties.—Whoever violates this section shall -

(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with this title, or imprisoned not more than 3 years, or both; except that for an offense involving exclusively a nonviolent physical obstruction, the fine shall be not more than $10,000 and the length of imprisonment shall be not more than six months, or both, for the first offense; and the fine shall, notwithstanding section 3571, be not more than $25,000 and the length of imprisonment shall be not more than 18 months, or both, for a subsequent offense; and except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

Relying on *Bird I*, the Court notes that of the three broad categories of activity under which Congress may exercise its commerce power, the third is the relevant area. Hence, if congressional authority exists at all, it exists under the third area of constitutional authority. *Bird* 124 F.3d at 676. This area permits Congress to regulate activities "having a substantial relation to interstate commerce where that activity substantially affects interstate commerce." *Lopez*, 514 U.S. at 558–89, 115 S.Ct. 1624; *United States v. Robinson*, 119 F.3d 1205, 1211 (5th Cir.1997). In determining whether anti-abortion activities substantially affect interstate commerce, we return to the Supreme Court's four relevant considerations pronounced in *Morrison*, 529 U.S. at 609, 120 S.Ct. 1740.

■ Section 248(a)(3) and (b)(2) are criminal statutes. It is apparent, from a reading of the statutes, that it criminalizes noneconomic, intrastate activities[13]. In the Court's view, anti-abortion activities do not represent, more so, an economic enterprise than does a public school zone. *See Morrison*, 529 U.S. at 610, 120 S.Ct. at 1749. Hence, the fact that economic activity occurs on or around a local school zone or in and around a local abortion clinic, does not automatically catapult the activity into the interstate arena. Anti-abortion activities are no more bound up with interstate commerce activities than is a local public school zone. Specifically, there is no interstate economic market for abortion clinic services except that identified as created by anti-abortionist; and congressional findings do not support a different conclusion. The fact that a person may travel across state lines to an abortion clinic for convenience, privacy or availability, does not alter the fact that the activity is intrastate and has, at most an insubstantial or attenuated affect on interstate commerce. *Id.* at 611–12, 120 S.Ct. at 1751. Thus, the Court concludes that FACE does not escape the "insubstantial/attenuated" effect tag.

The Court notes also that the statute does not contain an express jurisdictional element. Such a limitation would have the intended effect of limiting the statute's reach to a "discrete" set of abortion protestors. Alternatively, such a limitation would provide cover for a "discrete" set of abortion providers, abortion clinics, or users of abortion clinic services whose activities would have an "explicit connection with or effect on interstate commerce." *Morrison* 529 U.S. at 611–12, 120 S.Ct. at 1751. However, no discrete group is the target of the legislation.

The government relies on *Groome*, 234 F.3d 192, and *Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, for the argument that no jurisdictional element is necessary where Congress has cast its remedy over a wider and more purely interstate body of violent crime. This argument overlooks the fact that Congress does not by the FACE Act seek to regulate a larger economic activity that is an essential part of interstate commerce. The government's argument also overlooks the fact that there is no defined interstate criminal activity. All of the activity occurs within state lines.

■ The government also relies upon congressional findings to sustain its position that there is a sufficient interstate connection. However, the Supreme Court's reminder is appropriate here. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." 529 U.S. at 614, 120 S.Ct. at 1752 (citations omitted). Thus, whether an interstate activity is legally substantial is a question for the courts. *Id.*

Here, as in *Lopez* and *Morrison*, the government is following the "but-for" causal chain from the initial occurrence of violent crime [ ] to every attenuated effect upon interstate commerce. *Id.* "But for" Bird's violent act, doctors and patients would not cross state lines for abortion services. However, there is no campaign of violence aimed at providers across the nation by the defendant. There are no

---

**13.** The evidence fails to show that the federal government regulates the location of abortion clinics or the prices to be charged for the services provided. Nor is the evidence that Congress regulates the distribution of physicians who provide any such service. The regulation of intrastate activity that is not directed at the instrumentalities, channels or goods involved in interstate commerce has always been within the sole province of the states. U.S. CONST. amend X.

findings supporting the view that the defendant's conduct borders on interstate commerce, interferes with interstate commerce, threatens providers of interstate reproductive health services in interstate commerce, or in any way restricts the interstate movement of goods and people any more so than a person who commits a murder by use of an automobile. If anything, congressional findings support the opposite view.

Patients are traveling across state lines for services that are presumptively not available in their home state, for whatever reason. Hence, the Court concludes that, absent a jurisdictional element that satisfies the discreteness issue, Congress cannot regulate noneconomic, violent criminal conduct based on aggregation of interstate travels by doctors and patients for abortion services. *See Morrison* 529 U.S. at 617, 120 S.Ct. at 1754 (other citations omitted).

The Court also finds that the regulated activity is not an "essential part of a larger regulation of economic activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated." [14] *See Bird,* 124 F.3d at 675, (citing *Lopez,* 514 U.S. at 561). Congress' legislative findings fail to reveal a larger regulatory scheme that Congress seeks to protect by enacting § 248. Moreover, the regulatory purpose that is revealed in the Findings and Purpose statements is at most a general regulatory purpose that fails to establish any substantial relationship to a commercial activity. The fact that Congress says that it does more, does not make it so. *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624.

Finally, the Court is of the opinion that there is no rational basis for finding that a substantial relationship exists between the regulated activity and commerce. The regulated activity is noneconomic criminal conduct that is allegedly perpetuated at a local level. While doctors and abortion clinics engage in commerce at some level, that commerce was not the object of Congress' regulatory purpose. As observed earlier, enforcement of the Act has the effect of reducing interstate commerce activity. Certainly, Congress has passed legislation before that might arguably have as its purpose the reduction of interstate commerce activity. However, such as it was, the legislation was generally designed to prevent interference in or with Congress' regulation of a larger economic activity. *See Wickard,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122. Here, there is no larger regulated economic activity. In fact, there is no evidence in Congress' findings that the Houston clinic ever served anyone outside the boundaries of the city of Houston. Moreover, the government conceded in *Bird I* that there was no rational basis for finding that anti-abortion activities substantially affected interstate commerce, except by aggregation. 124 F.3d at 675.

## VII. CONCLUSION

It is clear that the FACE Act does not relate to the prohibition of interstate transportation of persons, items or services incident to some crime. It does not relate to possession or use of any item transported at any time in interstate commerce. And, it does not relate to an act of violence that may be used to financially support other illegal conduct that touches on interstate commerce.[15] Unlike *Perez,*

---

14. In order to aggregate, the regulated intrastate activity must also be an essential part of a larger economic regulatory scheme. *See GDF Realty Investments, Ltd. v. Norton,* 326 F.3d 622, 639 (5th Cir.2003). In the case at bar, no economic regulatory scheme is revealed.

15. In *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Supreme Court upheld Title II of the Consumer Credit Protection Act that was directed at extortion activities in credit transaction in intrastate commerce. The Court relied on the

where the intrastate criminal activities were generating income for other interstate criminal activity, there is no intrastate commercial activity generated by the anti-abortion activities that arguably generates funds for other criminal activity that is interstate in nature.

Because there is no larger regulatory scheme regulated by Congress that is threatened by intrastate activity and because there is no rational explanation for a distinction between the alleged violent act of the defendant and other local crimes committed by the use of an automobile, Congress' passage of § 248 was beyond Congress' Commerce Clause authority. The Court HOLDS that § 248 of the FACE Act is unconstitutional.

It is ORDERED that the indictment against Bird be and it is Dismissed with Prejudice.

fact that Congress had determined that organized crime was interstate in character and that a large part of organized crime's income

came from extortionate credit transactions. The Court held that intrastate "loan sharking" activities affected interstate commerce.